# EXHIBIT #2

# United States Court of Appeals
# for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

*October 26, 2023*

Nathan Ochsner, Clerk of Court

United States Court of Appeals
Fifth Circuit

**FILED**

October 4, 2023

Lyle W. Cayce
Clerk

No. 22-20537

DWAYNE WALKER,

*Plaintiff—Appellant,*

*versus*

CITY OF HOUSTON; SHANE C. PRIVETTE; DALTON T. WEBB;
STEVEN KIRKLAND HEIN; JOHN DOE,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-4454

Before STEWART, DENNIS, and WILSON, *Circuit Judges.*

PER CURIAM:[*]

Dwayne Walker filed this civil rights suit under 42 U.S.C. § 1983 against the City of Houston ("the City") and several police officers alleging that they used excessive force against him during his arrest in violation of his constitutional rights. The district court granted summary judgment in favor of the City and the officers and dismissed Walker's claims with prejudice.

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

Because the record evidence supports the district court's summary judgment, we AFFIRM.

## I. FACTUAL & PROCEDURAL BACKGROUND

In mid-2017, Walker was released on parole after serving approximately thirty years in prison for a variety of convictions ranging from drug crimes to burglaries.[1] Just a few months after his release, on November 14, 2017, Walker agreed to sell crack cocaine to an undercover police officer. The two then drove to a nearby location to pick up the drugs, as well as another individual named Heather Asbury that Walker identified as his girlfriend. After Walker agreed to sell the undercover officer the drugs, he told him that he was going to "run" if he (the officer) was "the law" because he (Walker) was not going "back to prison." The officer then drove Walker and Asbury to a Shell gas station and gave the signal to the other police officers that were waiting there to make the arrest.

Once the arrest signal was given, Officers Shane C. Privette and Dalton T. Webb approached Walker and Asbury. The following events were then captured on both officers' bodycams and, to some extent, the gas station surveillance cameras.[2] Webb approached first and told Asbury to exit the vehicle. She complied and was detained in handcuffs while the officers turned their focus to Walker. Privette approached Walker first and after a short discussion, told Walker to exit the vehicle. Walker complied by exiting the vehicle, and Privette instructed him to place his hands behind his back. Walker did not comply, however, and instead shut his vehicle door and

---

[1] According to Walker's deposition testimony, he was incarcerated for most of the time-period between 1989 and 2017.

[2] Although the gas station security cameras recorded some of the incident, the footage was not as clear as the officers' bodycam footage. For this reason, both parties and the district court rely primarily on the bodycam footage.

turned sideways with his left side toward the officer. Privette then grabbed Walker's left hand, put the handcuff on, and instructed him again to put both hands behind his back. Again, Walker did not comply. Instead, he pulled his right arm away from Privette and began saying "my shoulder," explaining that "it won't go back," presumably for purposes of being handcuffed, due to a past shotgun injury. Privette initially began to warn Walker that he was about to put him "on the ground" but then raised Walker's shirt (at Walker's request) and examined his shoulder injury. He then told Walker that he would cuff him in the front instead of the back due to his injury. Privette then instructed Walker to place his hands in front of him. Again, Walker did not comply. Instead, he started verbally protesting saying, "hold up," "okay, alright," and "look man," and began visibly pulling away from Privette. Privette then seized both of Walker's arms and took him to the ground as Walker was yelling "let me go man, let me go! I ain't did nothing!"[3] As Walker continued yelling, Webb and another officer ran to assist Privette in an effort to put the handcuff on Walker's other hand.

At this point, one of the officers delivered three or four "body shots" to subdue Walker by kneeing him on his body but he did not react or acknowledge the strikes, and instead continued to struggle underneath the officers.[4] Privette then backed up a few feet and delivered a knee strike to Walker's face after which Walker began yelling over and over "He hit me in the eye! Record it! Record it!" In spite of the knee strike to his face, Walker continued to yell, writhe, and struggle as the officers attempted to restrain him.

---

[3] At this point, Officer Privette's bodycam falls off but most of the rest of the incident is captured on Officer Webb's bodycam.

[4] The "body shots" to Walker's body are not visible from the bodycam footage but both parties acknowledge that the body shots took place at this time.

3

No. 22-20537

About 30 seconds later, the officers successfully placed the handcuffs on Walker with both hands behind his back. Once Walker was cuffed, Privette backed up and walked over to Asbury, while three other officers remained with Walker. By this time, Walker was bleeding from his head but still screaming obscenities and demanding that someone "record it!" Officers then began to instruct Walker to "relax" and "breathe" so he could get off the concrete and go sit in the patrol car, stating that they were "tired of fighting" him. Walker responded that he wanted to continue fighting and then told the officers that he was suicidal and wanted to die. The officers responded that they did not want Walker to die after which he unleashed a tirade of obscenities against them. Officers subsequently searched Walker and found a pair of scissors on his person. Paramedics were called as Walker continued to scream profanities.

A few minutes later, the officers ran a background check on Walker and learned that he had a "blue warrant" for a parole violation. One of the officers indicated that he had spoken to Walker after he was cuffed and confirmed with him that he had resisted the arrest due to the outstanding warrant. Walker was later diagnosed with closed fractures to his face and head. He was ultimately charged with felony delivery of a controlled substance to which he entered a guilty plea.

The following month, in December 2017, Walked filed a complaint with the Houston Police Department ("HPD") alleging that the force the officers used to detain him was unlawful. HPD Internal Affairs investigated the incident and issued a report exonerating Privette on grounds that his "actions were lawful, proper, and [] appropriate in response to Mr. Walker's active resistance."

Not satisfied with that result, Walker filed suit against the officers and the City in federal district court in 2019. In his amended complaint, he alleged

4

that the officers used excessive force against him during his arrest in violation of his constitutional rights. He sought compensatory damages, special damages, punitive damages, "economic loss" damages, attorneys' fees and costs, pre- and post-judgment interest, and declaratory and injunctive relief.

The officers and the City both moved for summary judgment. The district court granted summary judgment in favor of the officers and the City and dismissed Walker's claims with prejudice. In its memorandum opinion, the district court concluded that the totality of the circumstances established that the officers' conduct was not objectively excessive or clearly unreasonable, thus Walker's constitutional rights were not violated.[5] Because the district court held that there was no violation of Walker's rights, it did not reach the issue of qualified immunity. Walker filed this appeal.[6]

## II. STANDARD OF REVIEW

We conduct a de novo review of a district court's grant of summary judgment. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing FED. R. CIV. P. 56(a)). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could

---

[5] *See Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) ("A violation of [an individual's Fourth Amendment] right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force.").

[6] Although the district court in its Opinion and Order Granting Summary Judgment addressed a number of issues that Walker raised in his amended complaint, Walker's sole argument on appeal challenges the district court's ruling as to his Fourth Amendment excessive force claim against the officers. For this reason, he has forfeited all other claims on appeal (including those against the City) for failure to adequately brief them, and we do not address them herein. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 n.1 (5th Cir. 2021) (explaining that a party forfeits an argument by failing to brief it on appeal).

return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A panel may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (internal quotation marks and citation omitted). Although we view the evidence favorably to the nonmovant, we nevertheless "assign greater weight, even at the summary judgment stage, to the . . . video recording[ ] taken at the scene." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007) ("The Court of Appeals should not have relied on [the respondent's version of events]; it should have viewed the facts in the light depicted by the videotape.").

## III. Discussion

On appeal, Walker argues that summary judgment was improperly granted against him because (1) the severity of his crime did not warrant the amount of force used against him; (2) he was not an immediate safety threat to the officers; and (3) he was not resisting at the time of his arrest. His arguments, however, are entirely contradicted by the videotape footage in the record.

To establish that an officer used excessive force, a plaintiff must show that he "suffer[ed] an injury that result[ed] directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020). Factors guiding our inquiry into the objective reasonableness of the use of force include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). These considerations are to be

reviewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

### A. Severity of the crime

Walker contends that the district court erroneously held that this factor weighed in favor of the officers because the severity of his crime of possession and delivery of a controlled substance did not warrant the amount of force used by the officers. In support of his argument, he claims that he did not attempt to flee or disobey orders. His argument, however, is irrelevant to our analysis of this factor because it does not address the severity of his crime. As the district court concluded, Walker does not dispute that the officers had probable cause to arrest him for the delivery of a controlled substance, which is a serious offense. *See Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018) (concluding that the "severity of the crime" factor weighed in favor of the officers because the record indicated that they had probable cause to believe that the suspect was dealing drugs). Accordingly, we agree with the district court that this factor weighs in favor of the officers. *Id.*; *see also Joseph*, 981 F.3d at 333 (analyzing the severity of the crime factor based on whether the suspect was suspected of criminal activity or had committed the crime).

### B. Immediate threat to the safety of the officers and others

Walker next argues that a genuine factual dispute exists over whether he was an immediate threat to the safety of the officers and others because "during the search, no weapons were found" and "[t]he facts clearly show [that he] was compliant while placing his hands on the dashboard, exiting the vehicle, turn[ing] around to be handcuffed, and had one handcuff placed on[.]" Again, the videotape footage in the record does not support these statements.

As an initial matter, the record indicates that the officers did recover a pair of scissors after they were finally able to cuff and search Walker so his statement that "no weapons were found" is inaccurate and contradicted by the record. Moreover, as the district court observed, because Walker, a large man standing over six feet tall and weighing 200 pounds, backed away and refused to allow officers to place the handcuffs on both of his hands, he was in a significantly advantageous position over them because he could use the single cuff as a weapon and could also reach for any concealed weapons in his pockets. *See Cadena v. Ray*, 728 F. App'x 293, 296 (5th Cir. 2018) (unpublished) (observing that a suspect who backed away from officers after being ordered to place his hands behind his back posed "an immediate threat" to officers); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (explaining that the suspect posed an immediate threat to the safety of the officers because he refused "to turn around and be handcuffed"). For these reasons, we agree with the district court's conclusion that this factor also weighs in favor of the officers. *Id.*

### C. Resisting arrest

Finally, Walker maintains that the district court erroneously determined that this factor weighed in favor of the officers because he "complied with all commands of Privette" and "[a]t no point during this period did [he] resist arrest." Again, his argument is wholly belied by the videotape evidence in the record. As stated herein supra, Walker quite clearly resisted arrest from the moment Privette ordered him to exit the vehicle. First, he refused to allow Privette to cuff both of his hands by pulling away when the officer placed the handcuff on one hand and then attempted to cuff his other hand. Further, Walker continuously pulled his other hand away, claiming that he could not be cuffed in the back due to his injury, but the later videotape footage shows officers easily cuffing him from behind after he was restrained on the ground, indicating that his objections to being cuffed due to

his injury were a ruse to avoid being detained. Additionally, Walker continued to argue, scream, and curse at officers during the entire incident telling them to let him go and declaring that he "ain't did nothing." The videotape footage shows him physically fighting and resisting officers at every turn to the point where the officers actually told him to "quit fighting" and just "relax" and "breathe" so he could finally get off the concrete and sit in a patrol car. Indeed, Walker stated on the video that he wanted to keep fighting and that the officers should "kill [him]" because he was "suicidal." And in subsequent conversations between Walker and one of the officers, Walker admitted that he fought the officers (i.e., resisted arrest) because he knew he had a blue warrant for a parole violation and did not want to return to prison. He likewise warned the undercover officer before selling him the drugs that he planned to run if that officer was "the law."

Although it is undisputed that officers had to tackle and deliver three or four body shots to Walker in an attempt to restrain him, the videotape footage shows that Walker did not react to the "take-down" or the body shots and continued to actively struggle as several officers attempted to restrain him. Only after that point did Privette deliver a knee strike to Walker's face, which finally resulted in subduing him to some extent, although not entirely. As the videotape footage shows, even after the knee strike was delivered, officers continued to wrestle with Walker another 30 seconds or so as he screamed profanities before finally placing the handcuffs on both of his hands. Significantly, during this time, officers continued to plead with Walker to "quit fighting" and "relax" so the altercation could end, and he could sit more comfortably in the patrol car. The officers' actions as depicted on the videotape footage clearly align with this court's precedent holding that an officer's use of force is considered reasonable when it involves "measured and ascending responses" to the suspect's "escalating verbal and physical

No. 22-20537

resistance." *See Poole*, 691 F.3d at 629. For these reasons, we agree with the district court's conclusion that this factor weighs in favor of the officers. *Id.*

In sum, our review of the videotape footage reveals that all three objective reasonableness factors support the officers' use of force in this case. *Bartlett*, 981 F.3d at 332. Because the videotape footage clearly reveals that Walker undoubtedly posed an immediate threat to officers and others, aggressively resisting arrest both verbally and physically, and the situation was "tense, uncertain, and rapidly evolving," we hold that the officers' use of force in this case was "objectively reasonable" and not "clearly excessive." *Poole*, 691 F.3d at 629 ("This situation was 'tense, uncertain, and rapidly evolving,' and the officers' decision to use force to restrain [the suspect] was objectively reasonable. *Graham*, 490 U.S. at 396 . . . Because [the suspect], upon refusing to turn around and be handcuffed, posed an 'immediate threat to the safety of the officers' and 'actively resist[ed]' the officers' instructions, the use of force was not 'clearly excessive.'" (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009))); *see also Scott*, 550 U.S. at 380–81 (directing courts to view the evidence "in the light depicted by the videotape"). In light of this analysis, we hold that the district court did not err in rendering summary judgment in favor of the officers. *Sanders*, 970 F.3d at 561.

## IV. CONCLUSION

For the foregoing reasons, the district court's summary judgment is AFFIRMED.