# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Mia Searles, as administrator of the estate of Jalen Randle, Tiffany Rachal, Warren Randle, Jalen Randle, and Minor S.S.** *Plaintiffs*, | § § § § § | |
| **v.** | § § | **Civil Action No. 4:24-cv-01534** |
| **City of Houston, Troy Finner, Shane C. Privette, John Does No. 1-10** *Defendants*, | § § § § | |

## DEFENDANT OFFICER SHANE PRIVETTE'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Defendant Shane Privette ("Officer Privette"), and files his Motion for Summary Judgment pursuant to Rule 56, of the Federal Rules of Civil Procedure, and respectfully shows the Court as follows:

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................ii

NATURE AND STAGE OF PROCEEDINGS ............................................................................ 1

ISSUES PRESENTED AND STATEMENT OF FACTS............................................................ 1

    Statement of Issues ..................................................................................................... 1

    Statement of Facts....................................................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................................... 3

    Standard of Review...................................................................................................... 4

    Qualified Immunity Standard ...................................................................................... 5

    Officer Privette's Actions Were Objectively Reasonable Under Fourth Amendment
    Jurisprudence .............................................................................................................. 6

    Officer Privette is Entitled to Qualified Immunity. ....................................................... 15

    Conclusion .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Argueta v. Jaradi,* 86 F.4th 1084 (5th Cir. 2023) ................................................................... 17

*Ashcroft v. al-Kidd*, 563 U.S. 741 (2011) ........................................................... 6, 15

*Baker v. Coburn*, 68 F.4th 240 (5th Cir. 2023) ........................................................... 5

*Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) ........................................................... 7

*Batyukova v. Doege,* 994 F.3d 717 (5th Cir. 2021) ........................................... 15, 17

*Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010) ........................................................... 5

*Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) .............................................. 5

*Celotex Corp. v. Catreet*, 477 U.S. 317, 322 (1986) ........................................................... 5

*Cloud v. Stone*, 993 F.3d 379 (5th Cir. 2021) ................................................................... 17

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ........................................................... 6

*Garcia v. Blevins*, 957 F.3d 596 (5th Cir. 2020) ........................................................... 8

*Garza v. Briones*, 943 F.3d 740  (5th Cir. 2019) ........................................................... 8

*Graham v. Conner* 490 U.S. at 396 (1989) ........................................................................ 7

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ........................................................................ 16

*Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009) .................................................. 7, 15, 17

*McVae v. Perez*, 120 F.4th 487 (5th Cir. 2024) ................................................................ 7

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) ........................................................... 6

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019) .................................................. 5, 16

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) .................................................... 5, 6, 7, 17

*Pena v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) ....................................... 7

*Ramirez v. Knoulton,* 542 F.3d 124 (5th Cir. 2008) ........................................................ 15

*Ratliff v. Aransas County*, 948 F.3d 281(5th Cir. 2020). ................................................. 5

*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) ........................................................... 17

*Rich v. Palko*, 920 F.3d 288 (5th Cir. 2019) ................................................................... 5

*Romero v. City of Grapevine*, 888 F.3d 170 (5th Cir. 2018). .......................................... 7

*Roque v Harvel*, 993 F.3d 325  (5th Cir. 2021) ................................................................ 8

*Ryburn v. Huff*, 565 U.S. 469 (2012) ................................................................................ 8

*Salazar-Limon v. City of Houston*, 826 F.3d 272 (5th Cir. 2016) .................................... 8

*Scott v. Harris*, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d (2007) ...................... 5

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ..................................................... 8

*Tennessee v. Garner*, 471 U.S. 1 (1985) .................................................................. 7, 16

*Valderas v. City of Lubbock*, 937 F.3d 384 (5th Cir. 2019) ............................................. 7

*Vincent v. City of Sulphur*, 805 F.3d 543 (5th Cir. 2015). .............................................. 6

*White v. Pauly*, 580 U.S. 73 (2017) .................................................................................. 8

**Statutes**

Federal Rules of Civil Procedure, Rule 56 ................................................................. i, 5

# NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed suit on April 25, 2024, [Doc. #1], against Defendants, the City of Houston, Troy Finner, and Officer Shane Privette. Plaintiffs have alleged a Fourth Amendment excessive force claim against Officer Privette. On September 4, 2024, Officer Privette filed his 12(b)(6) motion to dismiss [Doc. #28]. On December 2, 2024, the Court convened for the initial conference and motions hearing, during which, the Court converted the motion to dismiss into a motion for summary judgment to thoroughly evaluate the documents attached to the motion to dismiss with a deadline to file summary judgment on January 31, 2025. On December 6, 2024, Plaintiffs requested a sixty-day extension [Doc. #39], and on December 17, 2024, the Court granted the extension for the sole purpose of allowing the limited discovery on Officer Privette's qualified immunity [Doc. #45]. Officer Privette now moves for summary judgment pursuant to Rule 56, Fed. R. Civ. P.

## ISSUES PRESENTED AND STATEMENT OF FACTS

**Statement of Issues**

(a) Whether Officer Shane Privette is entitled to qualified immunity from Plaintiffs' §1983 claim alleging excessive force in violation of the Fourth Amendment.

(b) Whether any genuine issue of material fact exists regarding Plaintiffs' allegations of excessive force under §1983, particularly in light of the body-worn camera footage.

**Statement of Facts**

1.      On April 27, 2022, Officer Shane Privette, a member of the Narcotics Tactical Team, participated in an operation to locate and apprehend Jalen Randle, a fugitive with three active felony warrants (Exhibit 1 at BS #64-67; Exhibit 5 at BS #37). These warrants included charges for aggravated assault of a family member, felon in possession of a weapon, and evading arrest in a motor vehicle, stemming from an incident that occurred on March 19, 2022, just one month prior. (Exhibits 2-4). During a pre-operation briefing, officers, including Officer Privette, were informed

of Randle's criminal history, his high propensity for violence, and his known possession of firearms (Exhibit 1 at BS #65-66; Exhibit 5 at BS #37; Exhibit 6 at BS #92; Exhibit 7 at 60:12-25). That afternoon, while conducting surveillance in the area Randle was to be apprehended, officers positively identified Randle entering the front passenger seat of a Chevy Equinox (Exhibit 5 at BS #38; Exhibit 6 at BS #97). A marked police unit, as part of the tactical operation, activated its lights and sirens to initiate a traffic stop on the vehicle. The vehicle, however, refused to stop, prompting a pursuit. (*Id.*; Exhibit 6 at BS #98)

2.      To end the pursuit, the marked police unit executed a Precision Immobilization Technique ("PIT maneuver"), successfully spinning the Chevy Equinox 180 degrees (Exhibit 5 at BS #39; Exhibit 6 at BS #98). The vehicle rolled to a stop facing the vehicle occupied by Officer Privette and Officer Mansker, who was driving. *Id.* Officer Mansker attempted to pin the Equinox by making controlled contact at a low speed to avoid deploying airbags (Exhibit 6 at BS #98). The reason for pinning the vehicle is to prevent the pursuit from continuing (Exhibit 6 at BS #107). As the Equinox rolled to a stop, Officer Privette's bodycam captured Randle exiting the passenger side of the vehicle and beginning to flee on foot (Exhibit 8 at 3:26). Officer Privette was expecting a foot chase when Randle initially exited the vehicle and fled (Exhibit 5 at BS #39; Exhibit 6 at BS #98).

3.      While Officer Privette was exiting his vehicle and observing Randle run, he saw Randle abruptly stop running and run back towards the Equinox. *Id.*  Officer Privette's bodycam captured Randle returning to the vehicle he had just fled from, and Randle reached into the front passenger area (Exhibit 8 at 3:28-3:29). Officer Privette observed Randle holding a dark object in his hand, which he believed to be a firearm (Exhibit 5 at BS #39; Exhibit 6 at BS #98). Randle then turned toward Officer Privette and Officer Mansker, holding the object (*Id.*; Exhibit 6 at BS #99; Exhibit

7 at 78:2-3).

4.      Based on his training and experience (Exhibit 10), Officer Privette recognized the significant danger posed by a suspect returning to a vehicle after fleeing on foot following a vehicular pursuit (Exhibit 7 at 94:18-95:4). He recalled training scenarios in which officers were fatally shot after allowing suspects to re-enter vehicles. *Id.* Additionally, Officer Privette asserted, the only reason a suspect would lose ground on the officers he is trying to evade would be to grab an instrument to help their escape, that would be a firearm (Exhibit 7 at 96:4-8). Coupled with Randle's known history of violence and firearm possession, Officer Privette perceived an imminent threat (Exhibit 5 at BS #39; Exhibit 6 at BS #98; Exhibit 7 at 96:10-17, 125:16-127:10). Officer Privette perceived the object in Randle's hands was a firearm, and that Randle was turning to fire at him and his partner, Officer Mansker (Exhibit 5 at BS #39; Exhibit 6 at BS #99; Exhibit 7 at 127:7-10).

5.       Officer Privette feared for his own life and for the life of his partner, which informed his decision to act (Exhibit 5 at BS #39). Officer Privette issued a command, stating, "Let me see your hands!" but Randle faced the officers with the object in his hand (Exhibit 5 at BS #39; Exhibit 7 at 88:1-11). Believing Randle posed an immediate threat to their safety, Officer Privette discharged his weapon, striking Randle in the front of the neck (Exhibit 5 at BS #39; Exhibit 6 at BS #99; Exhibit 9). Officer Privette's bodycam footage captured the rapid sequence of events, including Randle exiting the vehicle, returning to it, and reaching into the front passenger side (Exhibit 8 at 3:26-3:30). After the incident, officers recovered a dark-colored bag Randle retrieved from the Equinox, which contained a loaded firearm (Exhibit 7 at 82:16-83:8, 137:13-15).

## SUMMARY OF THE ARGUMENT

6.      Officer Shane Privette's actions during the apprehension of Jalen Randle were objectively reasonable under the totality of the circumstances and consistent with established Fourth

Amendment jurisprudence. Randle, a fugitive with three active felony warrants for violent offenses, posed a significant and immediate threat to the safety of the officers and the public. His evasive and unpredictable behavior, including fleeing from law enforcement, abruptly returning to the vehicle, and reaching into the front passenger area, necessitated a split-second decision by Officer Privette. The body-worn camera footage corroborates the immediacy and severity of the threat perceived by Officer Privette, further supporting the reasonableness of his actions.

7.    Officer Privette's use of force was justified under the principles established in *Graham v. Connor*, which require an evaluation of the severity of the crime, the threat posed by the suspect, and whether the suspect was actively resisting or evading arrest. Randle's violent criminal history, his active resistance, and his retrieval of a dark object—later confirmed to be a bag containing a firearm—underscore the significant threat he posed. Officer Privette's decision to act was informed by his training and experience, which emphasized the dangers of allowing suspects to re-enter vehicles during high-risk encounters.

8.    Furthermore, Officer Privette is entitled to qualified immunity as his conduct did not violate any clearly established constitutional right. At the time of the incident, no precedent would have placed a reasonable officer on notice that the use of force in these circumstances was unlawful. Qualified immunity protects officers who must make rapid decisions in tense and uncertain situations, and this case exemplifies such a scenario. The material facts demonstrate that Officer Privette's actions were reasonable and necessary to protect himself, his partner, and the public at large. In light of the absence of any genuine dispute of material fact and the clear applicability of qualified immunity, Officer Privette is entitled to judgment as a matter of law.

**V. ARGUMENT AND AUTHORITIES**

**Standard of Review**

9.    Summary judgment is proper under Rule 56, Federal Rules of Civil Procedure, if the

movant establishes that there is no genuine issue of material fact and the law entitles the movant to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catreet*, 477 U.S. 317, 322 (1986). However, a defendant's "good-faith assertion" of qualified immunity in a motion for summary judgment shifts this burden. *Ratliff v. Aransas County*, 948 F.3d 281, 287 (5th Cir. 2020). To survive summary judgment, the plaintiff must then present evidence demonstrating that the defense does not apply. *Id.* "Once an official pleads the [qualified immunity] defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

10.	Summary judgment evidence is reviewed in the light most favorable to the nonmoving party. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). However, when video footage captures the incident at issue, the Court relies on the facts depicted in the footage *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

**Qualified Immunity Standard**

11.	Qualified immunity is a robust defense which "protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). Qualified immunity represents the norm, and it should be denied only in rare circumstances. *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019); *see also Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (the Supreme Court holds that courts "must think twice before denying qualified immunity"). Governmental officials are protected from suit and liability by qualified immunity unless their alleged conduct: (1) violated a constitutional or statutory right; and (2) the illegality of the alleged conduct was clearly established at the time. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018). "Clearly established" means that, at the time of the officer's conduct, the law

was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. *Id.* at 63. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Id.; Ashcroft v. al-Kidd*, 563 U.S. 741, 735 (2011).

12.     This analysis depends upon whether, in light of the specific context of the case, not as a broad proposition, the "violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original). A plaintiff must identify "adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Id.*

13.     "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (citation omitted). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

**Officer Privette's Actions Were Objectively Reasonable Under Fourth Amendment Jurisprudence**

14.     To establish a Fourth Amendment excessive-force claim, a plaintiff must show that he

suffered "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018). "The second and third elements collapse into a single objective reasonableness inquiry," guided by the three *Graham* factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018); *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (citing *Graham*, 490 U.S. at 396). The Court 'must take heed to not define the relevant moment too narrowly but rather 'consider all of the circumstances leading up to that moment, because they inform the reasonableness of [the officer's] decision making.'" *McVae v. Perez*, 120 F.4th 487, 492-3 (5th Cir. 2024) (quoting *Mendez*, 823 F.3d at 333).

15.     Deadly force is clearly excessive and objectively unreasonable unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Romero v. City of Grapevine, 888 F.3d 170, 176 (5th Cir. 2018).* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Probable cause exists when, for example, the "officer reasonably believes that a suspect was attempting to use or reach for a weapon." *Valderas v. City of Lubbock*, 937 F.3d 384, 390 (5th Cir. 2019) (per curiam) (citing *Manis v. Lawson*, 585 F.3d 839, 844–45 (5th Cir. 2009). "We 'consider [ ] only the facts that were knowable to the defendant officer [ ]'" when the officer used force. *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam)). And we ask, "whether a reasonable officer in the same circumstances would have concluded that

a threat existed justifying the particular use of force." *Roque v Harvel*, 993 F.3d 325, 333 (5ᵗʰ Cir. 2021). "[W]e are careful to avoid 'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'" *Garza*, 943 F.3d at 745 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam)). Additionally, when it comes to armed individuals, "we have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *Garcia v. Blevins*, 957 F.3d 596 (5ᵗʰ Cir. 2020) (quoting *Salazar-Limon v. City of Houston*, 826 F.3d 272 (5th Cir. 2016)).

16.     In the case at bar, Officer Privette objectively did not violate the Fourth Amendment. Officer Privette's perception that Randle posed an imminent threat was informed by the totality of the circumstances. Based on Randle's actions—specifically his sudden return to the vehicle, his retrieval of a dark object, and his movement toward the officers—combined with Privette's knowledge of Randle's recent violent history and firearm possession, Privette reasonably believed that the object in Randle's hands was a firearm, and that Randle was going to fire at him and his partner. Officer Privette feared for his own life and for the life of his partner, as Randle was an imminent threat.

### The Severity and Violent Nature of Randle's Crimes.

17.     Jalen Randle, a convicted felon, was wanted on three active felony warrants at the time of the incident. These warrants included charges for aggravated assault of a family member, felon in possession of a weapon, and evading arrest in a motor vehicle, which occurred just one month prior to the Narcotics Tactical Team attempting to arrest Randle (Exhibits 2-4). Each of these charges underscored the serious and violent nature of Randle's criminal conduct, as well as the significant threat he posed to public safety and law enforcement.

18.     Officer Privette, along with other members of the Narcotics Tactical Team, was tasked

with apprehending Randle for these violent offenses (Exhibit 1). Prior to the operation, Officer Privette was briefed on Randle's criminal history and the circumstances surrounding the charges. *Id.* This included knowledge of probable cause statements that led to the issuance of the warrants, such as Randle's prior threats to shoot a complainant, his previous escape from law enforcement, and the discovery of a firearm left in the vehicle he used to previously evade capture (Exhibit 7 at 94:7-15).

19.     As part of the tactical briefing, Officer Privette was also informed of Randle's known history of carrying firearms and his high propensity for violent behavior (Exhibit 5 at BS #37; Exhibit 6 at BS #86). The totality of this information—Randle's violent criminal history, his active felony warrants, and his known possession of firearms—highlighted the severity of the situation and the violent crimes Randle was due to be arrested for.

**The Imminent Threat of Jalen Randle.**

20.     Jalen Randle posed a significant and immediate threat, amplified by the violent nature of the crimes for which he was being apprehended. These charges, combined with his known history of violence and firearm possession, underscored the danger he presented. The threat escalated further when Randle actively resisted arrest during a vehicle pursuit. The pursuit began when a marked police unit, with lights and sirens activated, attempted to conduct a traffic stop on the vehicle in which Randle was a passenger (Exhibit 5 at BS #38; Exhibit 6 at BS #98). The vehicle refused to stop, prompting officers to execute a PIT maneuver to end the pursuit (Exhibit 5 at BS #39; Exhibit 6 at BS #98). This maneuver caused the vehicle to spin 180 degrees and come to a stop. *Id.* As the vehicle halted, Randle exited and fled on foot (Exhibit 8 at 3:26). Officer Privette, still inside his vehicle, observed Randle's actions of running from the vehicle and began to exit his own vehicle. (Exhibit 5 at BS #39; Exhibit 8 at 3:27).

21.     However, Randle abruptly turned back, returning to the vehicle he had just fled, and reached into the front passenger area (Exhibit 5 at BS #39; Exhibit 6 at BS #98). Randle emerged from the vehicle holding a dark object, which Officer Privette reasonably perceived to be a firearm. *Id.* This perception was grounded in Randle's criminal history, his known propensity for carrying firearms, and the tactical briefing that highlighted the dangers he posed. *Id.* Officer Privette's training further reinforced the understanding that a suspect returning to a vehicle during a pursuit only does so to retrieve a weapon (Exhibit 7 at 96:4-8).

22.     Randle's actions placed him directly in front of Officer Privette and Officer Mansker, who was still in the process of securing their vehicle. As the driver, Officer Mansker was responsible for pinning the suspect's vehicle while avoiding airbag deployment (Exhibit 6 at BS #98). Officer Mansker additionally has to put the vehicle in park, unbuckle his seatbelt, and keep his eyes on the suspect (Exhibit 6 at BS #108). During this time, Officer Privette served as Officer Mansker's protection (Exhibit 6 at BS #108; Exhibit 7 at 127:19-128-3.) The totality of the circumstances left no doubt in Officer Privette's mind that Randle posed an imminent threat (Exhibit 7 at 97:4-11).

**Jalen Randle's Active Resistance.**

23.      Jalen Randle's active resistance to law enforcement was a critical factor in the events leading to Officer Privette's use of force. One of the three felony warrants for Randle's arrest was for evading arrest, a charge stemming from a recent prior incident in which Randle fled from police on foot, did not return to his vehicle, and left a firearm in the vehicle he had used to evade capture (Exhibit 4).

24.     On April 27, 2022, Randle actively resisted law enforcement efforts. Officer Privette's body-worn camera (BWC) captured the sequence of events. Still shots from the footage show Randle exiting the passenger side of the vehicle immediately after it came to a stop following a

PIT maneuver (Exhibit 8 at 3:26).



25.    Randle's initial exit from the vehicle and flight on foot, demonstrates his initial refusal to

comply with commands to stop. At this point, Officer Privette is attempting to exit his vehicle, and

Randle is fleeing from the vehicle and out of view on the BWC (*Id.* at 3:27).



26.     As officer Privette exits his vehicle, his BWC captures the return of Randle to the vehicle he had just fled. This movement was both sudden and alarming, as it suggested an intent to retrieve an object from the vehicle, which he did (*Id.* at 3:28).



27.     A critical still shot shows Randle reaching into the front passenger area of the vehicle. This action was unexpected and dangerous, further escalating the situation. Recognizing the potential threat, Officer Privette unholstered his weapon and issued a clear verbal command: "Let me see your hands!" (*Id.* at 3:29)



Randle reaching in vehicle

28.     Randle then emerges from the vehicle holding an object that Officer Privette believed to be firearm based on the totality of the circumstances (Exhibit 7 at 97:7-11). This belief was informed by Randle's known history of violence, prior firearm possession, and the tactical briefing that emphasized his propensity for carrying weapons. The object Randle retrieved was later confirmed to be a bag containing a loaded firearm (Exhibit 7 at 82:16-83:8, 137:13-15).



**Reasonableness of Officer Privette's Actions**

29.     Officer Privette's decision to use force was made in a rapidly evolving and high-stakes situation, consistent with the principles established in *Graham v. Connor.* Randle's actions during the encounter—fleeing from law enforcement, abruptly returning to the vehicle, and reaching into the front passenger area—posed an immediate and significant threat to Officer Privette and the officers on scene. Based on his training and experience, which included scenarios where officers were fatally injured after allowing suspects to re-enter vehicles, Officer Privette recognized the significant danger posed by Randle's actions. The rapid and unpredictable nature of the encounter left no time for Officer Privette to wait and see if Randle would comply with further commands. Fearing for his own life and for the life of his partner, Officer Privette's use of force was a measured and necessary response to an imminent threat.

30.     Given these factors, there is no aspect of the *Graham* analysis that supports the Plaintiffs'

claims. Officer Privette's actions were consistent with established Fourth Amendment jurisprudence, which recognizes that officers must often make split-second decisions in tense and uncertain circumstances. *Graham,* 490 U.S. at 396-97. As Officer Privette's actions were reasonable under the totality of the circumstances, there is no Fourth Amendment violation. The constitution does not require an officer to wait until a suspect is holding a weapon, pointing it, or shoots, to confirm the threat before resorting to deadly force. *Ramirez v. Knoulton,* 542 F.3d 124, 128-31 (5th Cir. 2008). "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm.'" *Batyukova v. Doege,* 994 F.3d 717, 725 (5th Cir. 2021) (alteration in original) (quoting *Manis v. Lawson,* 585 F.3d 839, 843 (5th Cir. 2009)).

**Officer Privette is Entitled to Qualified Immunity.**

31. Officer Privette is entitled to qualified immunity as his actions did not violate Jalen Randle's constitutional rights, nor did they contravene any clearly established law. Qualified immunity shields government officials from liability when their actions could reasonably have been believed to be lawful. *See Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). To overcome this protection, Plaintiffs must demonstrate both that a constitutional right was violated and that the right was clearly established at the time of the incident. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

32. Even assuming *arguendo* that Officer Privette violated a Fourth Amendment right, no clearly established law would have placed him on notice that his actions were unconstitutional. The Supreme Court has emphasized that existing precedent must place the legality of an officer's actions "beyond debate" such that every reasonable official would understand that their conduct violates a constitutional right. *See al-Kidd*, 563 U.S. at 741. Furthermore, in excessive force cases, "unless existing precedent squarely governs the specific facts at issue," the officer is entitled to

qualified immunity. *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

33.     The specificity requirement is particularly significant in excessive force cases, where officers must make split-second decisions in rapidly evolving situations. *See Kisela*, 138 S. Ct. at 1153. Here, only four seconds elapsed between the time Randle exited the vehicle and the time Officer Privette discharged his weapon (Exhibit 8 at 3:26-3:30). During this brief period, Randle fled, abruptly returned to the vehicle, reached into the passenger side, and faced the officers with an object in his hand. These actions created a rapidly escalating and dangerous situation, leaving no time for further deliberation.

34.     Plaintiffs purportedly locate the clear establishment of the constitutional right they invoke in *Tennessee v. Garner*. "For decades, the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of a fleeing citizen that does not pose an immediate threat to officers or others. *See,* e.g., *Tennessee v. Garner*, 471 U.S. 1, 2 (1985)." [Doc. #1 at 54]. However, *Garner* is clearly inapposite to the facts of this case. In *Garner*, the Supreme Court held that deadly force may not be used against a fleeing suspect unless the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others. Unlike the suspect in *Garner*, who was unarmed, non-dangerous, and merely fleeing, Randle's actions—fleeing, abruptly returning to the vehicle, and retrieving an object reasonably perceived as a firearm— posed an immediate and significant threat to the safety of the officers.

35.     The specific context of this case—where a suspect with a violent history abruptly returned to a vehicle during a high-risk encounter and retrieved an object reasonably perceived as a firearm—distinguishes it from any precedent that could place Officer Privette's actions beyond

debate. Courts have repeatedly emphasized the necessity of fact-specific analysis in qualified immunity cases. *See Mullenix v. Luna*, 577 U.S. at 12. The rapidly evolving nature of the encounter, combined with Randle's known history of violence and firearm possession, underscores the reasonableness of Officer Privette's actions and highlights the absence of any clearly established precedent that would have prohibited his conduct under these circumstances.

36.     Additionally, the Fifth Circuit has consistently held "officers use lethal force justifiably if they reasonably believe the individual is reaching for a gun. *Cloud*, 993 F.3d at 387. The Fifth Circuit has "adhered to this standard even in cases when officers had not yet seen a gun when they fired, or when no gun was ever found at the scene." *Id; Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991); *Manis*, 585 F.3d at 843; *Salazar-Limon*, 826 F.3d at 278; *Argueta v. Jaradi,* 86 F.4th 1084, (5th Cir. 2023); *Batyukova v. Doege,* 994 F.3d 717 (5th Cir. 2021).

37.     As the totality of the circumstances guided Officer Privette's actions and no clearly established law would put Officer Privette's actions "beyond debate," Officer Privette is entitled to qualified immunity.

**Conclusion**

The material facts demonstrate that Officer Privette's actions were objectively reasonable under the totality of the circumstances. His use of force was consistent with established Fourth Amendment jurisprudence, which recognizes the necessity of split-second decision-making in tense and uncertain situations. Furthermore, Officer Privette is entitled to qualified immunity, as no clearly established law would have placed him on notice that his conduct was unconstitutional. Accordingly, Officer Privette respectfully requests that the Court grant his motion for summary judgment.

Respectfully submitted,

**ARTURO G. MICHEL**
**City Attorney**

CHRISTY L. MARTIN
Chief, Torts/Civil Rights

By:    /s/ Alexander Garcia
        Alexander Garcia
        Assistant City Attorney
        SBN: 24104429
        FBN: 3852904
        832.393.6293
        Alexander.garcia@houstontx.gov
        CITY OF HOUSTON LEGAL DEPARTMENT
        900 Bagby, 4th Floor
        Houston, Texas 77002
        832.393.6259 Facsimile

        ***Attorneys for Defendant,***
        ***Officer Shane Privette***

## VERIFICATION

I hereby verify, under penalty of perjury, that the records attached as Exhibits 1-10 contain true and correct copies of the documents they are represented to be.

March 28, 2025        /s/ Alexander Garcia
Date        Alexander Garcia

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing was filed via CM/ECF and served via electronic filing manager to all counsel of record.

        /s/ Alexander Garcia
        Alexander Garcia