United States District Court
Southern District of Texas
**ENTERED**
August 09, 2025
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MIA SEARLES, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-24-1534 |
| | § | |
| CITY OF HOUSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

In April 2022, Houston police officers pursued Jalen Randle to execute active felony warrants for aggravated assault of a family member, being a felon in possession of a firearm, and evading arrest in a motor vehicle. The officers attempted a traffic stop using the siren and lights, but the car in which Randle was a passenger drove away. When the officers were able to stop and block Randle's car, he got out of the passenger side, then reached into the passenger side door and emerged holding an unidentified object. One of the officers got out of his police car yelling "show me your hands" and shot Randle. The shot was fatal.

Randle's family filed this lawsuit. The parties conducted discovery on qualified immunity. Privette now moves for summary judgment, arguing that he is entitled to qualified immunity as a matter of law. (Docket Entry No. 61). Based on the record, the motions, the summary judgment evidence—including the footage from Privette's body-worn camera—and the applicable law, the court grants Privette's motion for summary judgment. The reasons for this ruling are set out below.

## I.    Background

The facts in this section are largely drawn from the deposition of Officer Shane Privette and from his body-worn camera footage, both part of the summary judgment record. On April 27,

2022, Privette, a member of the Houston Police Department Narcotics Tactical Team, was part of

an operation to find and arrest Jalen Randle. (Docket Entry No. 61 at 4; Docket Entry No. 61-1;

Docket Entry No. 61-5 at 3). Randle had three active felony warrants—for aggravated assault of

a family member, being a felon in possession of a weapon, and evading arrest in a motor vehicle—

stemming from an incident a little over a month earlier. (*Id*.; Docket Entry Nos. 61-2 to 61-4).

Privette was in a police car driven by Officer Mansker. (Docket Entry No. 61-5 at 3). They saw

Randle getting into the passenger's seat of a Chevy Equinox. (Docket Entry No. 61 at 5; Docket

Entry No. 61-5 at 4; Docket Entry No. 63-1 at 28). The officers activated the lights and sirens to

signal the driver of the Chevy Equinox to stop. (Docket Entry No. 61 at 5; Docket Entry No. 63-

1 at 29). When the Chevy Equinox failed to stop and instead drove away, the officers pursued.

(Docket Entry No. 61 at 5; Docket Entry No. 63-1 at 29).

To stop the Chevy Equinox, Mansker executed a "precision immobilization technique."

(Docket Entry No. 61 at 5; Docket Entry No. 61-5 at 3; Docket Entry No. 63-1 at 29). This

technique is used to stop a fleeing vehicle by causing it to spin out and come to a stop. The

maneuver resulted in the Chevy Equinox spinning 180 degrees and rolling to a stop facing the

police car. (Docket Entry No. 61 at 5; Docket Entry No. 61-5 at 4; Docket Entry No. 63-1 at 29).

Mansker and Privette then tried to stop the Chevy from driving away by using a "controlled

contact" at a low speed. (Docket Entry No. 61 at 5; Docket Entry No. 63-1 at 29, 39). Randle got

out of the passenger side of the Chevy. (Docket Entry No. 61 at 5). Privette got out of the police

car. (Docket Entry No. 61 at 5). Privette testified that he saw Randle begin to run away, then stop,

turn back towards the Chevy, and reach into the front passenger side. (Docket Entry No. 61 at 5;

Docket Entry No. 61-5 at 5). Privette testified that he saw Randle emerge from the passenger side

holding a dark-colored oblong object that Privette reasonably believed was or contained a firearm.

(Docket Entry No. 61 at 5; Docket Entry No. 61-5 at 5; Docket Entry No. 63-1 at 29).    Privette testified that Randle turned toward him and Mansker while holding the object.  (Docket Entry No. 61 at 5; Docket Entry No. 61-5 at 5; Docket Entry No. 63-1 at 30; Docket Entry No. 61-7 at 78:2-3).  Privette testified that he perceived an imminent threat of Randle shooting at him and Mansker.  (Docket Entry No. 61 at 6; Docket Entry No. 61-5 at 5; Docket Entry No. 63-1 at 30; Docket Entry No. 61-7 at 97:10-11, 125:16-127:10).    Privette yelled at Randle, "Let me see your hands!"  (Docket Entry No. 61 at 6; Docket Entry No. 61-5 at 5; Docket Entry No. 61-7 at 88:1-11).  Almost simultaneously, Privette fired, hitting Randle in his neck.  (Docket Entry No. 61 at 6; Docket Entry No. 61-5 at 5; Docket Entry No. 63-1 at 30; Docket Entry No. 61-9).  After the shooting, officers recovered the object that Randle had retrieved from the vehicle and was holding when he was shot.  (Docket Entry No. 61 at 6).  It was a bag that contained a loaded firearm.  (*Id.*; Docket Entry No. 61-7 at 82:16-83:8; 137:13-15).

The plaintiffs allege that the summary judgment evidence shows that after Randle got out of the car and prepared to flee, he turned back to retrieve a toiletry bag—not a gun—from the car.  (Docket Entry No. 66 at 8).  The plaintiffs argue that when Privette shot Randle, his hand was at his waist, holding the bag, and that he was not raising his arms, reaching into the bag, pointing any object at the officers, "or mak[ing] any other threatening gestures or movements."  (*Id.*).  The plaintiffs allege that Privette fired his weapon without giving Randle time to comply with Privette's order to "show me your hands."  (*Id.* at 9).

Privette attaches footage from his body-worn camera to his motion for summary judgment.  (Docket Entry No. 61-8).  The footage is of little help.  Until the moment that Privette shoots, Randle is largely out of view or the view of him is obscured.  The footage begins in the interior of Privette's moving police car.  It is daylight.  The driver—Mansker—tells Privette to "get ready to

run." (Docket Entry No. 61-8 (video) at 2:31).[1]  Privette responds, "yeah, I am." (*Id*. at 2:32).

Privette and another officer discuss their locations on their dispatch radios, (*id*. at 2:33-2:52), and

Privette says, "he [referring to Randle] ain't gonna leave this neighborhood." (*Id*. at 2:53-2:54).

Another officer speaking over the radio says, "I'm going to pin him in just a second, so you guys

get ready." (*Id*. at 2:57-3:00).  Mansker says, "I'm going to box him in." (*Id*. at 3:10).  Privette

says, "Clear." (*Id.* at 3:11).  Privette then says, "He's going to go back to that house." (*Id.* at

3:20).  Over the radio, an officer tells Mansker and Privette that the vehicle Randle is in is traveling

"westbound." (*Id*. at 3:19-3:21).

   The body-worn camera footage shows that Privette begins to remove his seatbelt as his

police car stops. (*Id.* at 3:21-3:26).  Privette opens the passenger side door and begins to step out

of the car with his weapon drawn. (*Id*. at 3:27-3:28).  Randle can be seen facing Privette. (*Id*.).

Because Privette is holding his firearm with his arm extended, the view of Randle is obscured.  It

is unclear that he is holding an object, much less what it might be.  Privette yells, "let me see your

hands" and fires a shot before he finishes saying the word "hands." (*Id*. at 3:29-3:30).  Randle

falls over onto the curb, and an object that he was apparently holding falls to the ground. (*Id*.).

Privette yells "oh shit" and runs towards Randle with his gun still drawn. (*Id.* at 3:30-3:34).

   Several officers turn Randle over onto his stomach and begin to handcuff him. (*Id.* at 3:35-

3:40).  The video shows that Randle is barefoot. (*Id*. at 3:47).  A gray bag is visible on the ground

next to Randle's body. (*Id.* at 3:56-4:01).  Privette drags Randle away from the curb and lays him

on the grass and sidewalk. (*Id*. at 4:05-4:10).  Randle, bleeding from the left side of his neck, is

seen struggling to move his mouth while several officers discuss calling for medical help and

whether they can safely move Randle. (*Id*. at 4:28-4:48).  The officers prepare to treat Randle with

---

[1]  Times refer to the start of the quoted language or described event and are approximate.

items that they pull out of a medical kit.  (*Id.* at 4:47-5:11).  Privette says, "keep breathing buddy, keep breathing"; "keep breathing, bud, keep breathing."  (*Id*. at 4:37-4:39; 5:09-5:10).  Privette and the other officers apply gauze and pressure to Randle's neck wound.  (*Id.* at 5:13-5:32).

Someone says, "whose shot?"  (*Id.* at 5:29).  Privette responds, "my shot" and raises his hand.  (*Id*. at 5:30).  He gets up and goes to talk to another officer.  (*Id*. at 5:31-5:37).  Privette tells the other officer, "He went back to that vehicle" . . . "and then he came out."  (*Id.* at 5:39).  Another officer tells Privette, "you can turn off your body worn camera now."  (*Id.* at 5:53-5:56).  Privette says, "All right, Sergeant Medina says I can turn off my body worn camera."  (*Id*. at 5:57-6:00).  The footage ends.  (*Id*. at 6:00).

The summary judgment issue is whether there are factual disputes material to determining Privette's qualified immunity.  The court finds that there are not, and that summary judgment on qualified immunity is appropriate, because the only—if limited—evidence in the summary judgment record shows that Privette's use of deadly force was objectively reasonable under the circumstances, and because the plaintiffs have not shown that Privette violated clearly established law.

## II.    The Legal Standards

### A.  Summary Judgment

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is genuine 'if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San*

*Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250).

### B. Qualified Immunity

Qualified immunity operates to protect police officers from liability in the reasonable performance of their duties. "Even if a police officer's conduct falls short of the Fourth Amendment's reasonableness requirement, the officer, like other public officials sued under 42 U.S.C. § 1983, is protected by the qualified immunity doctrine." *Singleton v. Casanova*, 2024 WL 2891900, at *8 (5th Cir. June 10, 2024). "It is an affirmative defense; once properly raised by the defendant, the 'plaintiff has the burden to negate the assertion of qualified immunity.'" *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"A plaintiff can overcome a qualified immunity defense by showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam)

(quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)).  Courts have discretion to decide which of the two elements to address first.  *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

## III.   Analysis

### A.  The Reasonableness of Privette's Use of Deadly Force

The parties agree that there is not "much of a dispute" about "the events leading up to the shooting itself."  (Docket Entry No. 79 at 7:11-13).  The question is whether "whether Mr. Randle did anything for Officer Privette to reasonably perceive that he posed an immediate and serious threat of harm."  (*Id*. at 7:21-22).

Privette argues that his actions were objectively reasonable under the totality of the circumstances and established Fourth Amendment jurisprudence.  (Docket Entry No. 61 at 6-7). Privette emphasizes that when he shot Randle, he knew that Randle was a fugitive with three active felony warrants for violent offenses, including being a felon in possession of a firearm; Randle had fled by car from pursuing officers; and when officers stopped that car, Randle got out and appeared prepared to run, but then turned back towards the car, reached into the front passenger door, and stood up holding an object that Privette described as dark-colored and oblong.  (*Id.* at 7). Privette testified that he reasonably believed that the object was a firearm and posed a significant and immediate threat to the safety of the officers at the scene.  (Docket Entry No. 66-1 at 91:1-2 ("At the time I shot Mr. Randle, I thought the bag was a firearm.")).

The plaintiffs argue that the record supports finding that Privette did not reasonably perceive an imminent deadly threat when he shot Randle.  (Docket Entry No. 66 at 13).  The plaintiffs argue that Privette is not entitled to qualified immunity because he violated clearly established law holding that efforts to apprehend a suspect who poses no immediate threat of serious bodily harm to officers or the public do not justify the use of deadly force.  (*Id*. at 22, 24).

The court first turns to whether, under the totality of the circumstances, Privette's use of force was objectively reasonable or excessive. To prevail on a claim for excessive force under § 1983, a plaintiff must show "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). Because Privette used deadly force against Randle, "injury and causation are established, leaving only the 'excessive' and 'reasonableness' elements." *McVae v. Perez*, 120 F.4th 487, 492 (5th Cir. 2024).

"To determine whether the force used on a suspect was excessive, we consider the three *Graham* factors: (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. "When an excessive force claim involves deadly force, the threat-of-harm factor 'typically predominates,' and the excessive and reasonableness elements become two sides of the same coin." *Id.* (quoting *Harmon v. City of Arlington, Tex.,* 16 F.4th 1159, 1163 (5th Cir. 2021)). "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

Factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," as well as other relevant

circumstances, "may bear on the reasonableness or unreasonableness of the force used." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Recently, the Fifth Circuit has emphasized additional factors, including: the speed with which an officer resorts to using force rather than verbal commands; the amount of time that an officer has to decide the type and amount of force to use; whether the officer responds with "measured and ascending" actions corresponding with the suspect's "escalating verbal and physical resistance" or aggression; whether the suspect ignored any of the officer's prior commands; whether the suspect has a weapon or acts in a manner suggesting the intended use of a visible—or hidden—weapon; whether the suspect moves outside the officer's line of vision; whether the suspect acts in an erratic, unexplained manner; and whether the suspect moves toward or away from an officer. *See Singleton v. Casanova,* 2024 WL 2891900, at *5 (5th Cir. June 10, 2024).

The Supreme Court recently held that in evaluating claims for excessive force, courts must look beyond the "moment of threat" to consider whether earlier facts and circumstances may have influenced a reasonable officer's actions at the time of the use of deadly force. *See Barnes v. Felix*, 145 S. Ct. 1353 (2025). Because "[p]rior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening," under the totality-of-the-circumstances analysis, courts must also consider "historical facts." *Id.* at 1358, 1359. While "the situation at the precise time of the shooting will often be what matters most," the Court emphasized that "'the totality of the circumstances' inquiry into a use of force has no time limit." *Id.* at 1358.

Under the first *Graham* factor, the court considers the severity of the crime. Randle was a convicted felon who was wanted on three active felony warrants, including for aggravated assault

of a family member, for being a felon in possession of a weapon, and for evading arrest in a motor vehicle. (Docket Entry Nos. 61-2, 61-3, 61-4). The warrants stemmed from an incident that had occurred over a month earlier, but the relevant point is that Privette and the other officers involved in pursuing and apprehending Randle knew that he had a history of violence and of illegally possessing firearms. The crimes for which Privette and the HPD sought to apprehend Randle were felonies demonstrating a propensity for violence.

Under the second *Graham* factor, the issue is whether Randle was actively resisting arrest or attempting to evade arrest by fleeing when he was shot. The parties do not dispute that Randle had tried to evade arrest, first by refusing to stop his vehicle and leading the police on a chase, then by appearing ready to run when the police blocked his car before he turned back to the car and retrieved an object from the passenger side when Privette shot him. This factor also weighs in favor of finding that Privette's use of force was reasonable.

The "threat-of-harm" factor is the most critical. "[I]t is manifestly unreasonable for an officer to seize a suspect the officer knows is unarmed and not aggressive by shooting him dead." *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023). "But if the officer believes the suspect has a gun, the calculation changes—even if there was never, in fact, a gun." *Id*. "Uses of force may be reasonable when the officer could reasonably believe the suspect was reaching for or had a gun." *Winder v. Gallardo*, 118 F.4th 638, 646 (5th Cir. 2024). "The question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances." *Allen*, 65 F.4th at 744. "To show a triable issue, a plaintiff must generally 'present competent summary judgment evidence that the arrestee did not reach . . . for what the officer reasonably perceived to be a weapon.'" *Cloud v. Stone*, 993 F.3d 379, 387 (5th

Cir. 2021) (quoting *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278 (5th Cir. 2016)) (alterations adopted).

Under *Barnes v. Felix,* the court must consider not only the events that occurred just before Privette shot Randle, but also the circumstances that would have caused Privette to reasonably believe that Randle was reaching for a gun when Privette shot him.  It is undisputed that Privette knew that Randle was subject to arrest warrants for aggravated assault on a family member, illegally possessing a firearm, and evading arrest as recently as a month earlier.  It is undisputed that the car Randle was in refused to comply with the attempted traffic stop by the marked police vehicle and instead drove away, pursued by the police vehicle.  When the police officers stopped the car Randle was in, he got out of the passenger side, turned away from the car, then turned back, reached into the passenger side, and emerged carrying an unidentified object.  Privette testified that when Randle first got out of the car, Privette could not see what was in Randle's hands, only that he held an unidentified object.  Privette testified that it was only when Randle turned towards Privette and Mansker that Privette could see that the object Randle held in front of him was large enough to be or hold a gun.  (Docket Entry No. 66-1 at 88:7-11).  Those facts weigh in favor of finding that the use of force was reasonable.

The court next turns to the body-worn camera footage.  "[A] court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."  *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018).  Privette attaches still shots from the body-worn camera footage that he claims show that Randle got out of his car when the officers blocked it, prepared to flee on foot, then returned to the car and retrieved an object from the front passenger seat.  (Docket Entry No. 61 at 14-16).  The body-worn camera footage is inconclusive but not inconsistent with Privette's testimony.  Both the still shots

and the body-worn camera footage do not clearly reflect the positioning of Randle's hands when he was shot or whether he was holding an object (or what that object was). The officers' conversation just before Randle is shot is focused on preventing Randle from fleeing into a nearby house to avoid arrest, not on their fear that Randle might be armed. The object Randle was holding when Privette shot him was later discovered to be a closed bag. The fact that the bag contained a loaded firearm was not known to the officers when the shooting occurred. (Docket Entry No. 66-1 at 140:14-18).

"[M]erely having a gun in one's hand does not *per se* equate to dangerousness or a threat." *Rainwater v. Sikes*, 2018 WL 1916566, at *4 (N.D. Tex. Apr. 23, 2018) (citing *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008)). "If the officer could reasonably use less than deadly force, he must." *Allen*, 65 F.4th at 745. The footage from the body-worn camera shows that: (1) Privette shot Randle a split second after Privette ordered Randle to show his hands; and (2) Privette did not wait for Randle to comply with that order before shooting him. Giving a suspect an order without giving time to comply does not support using deadly force based on the suspect's failure to comply. Privette did not give a meaningful warning before he shot Randle. *See, e.g.*, *Allen v. Hays*, 65 F.4th 736, 745 (5th Cir. 2023) ("even when a suspect is armed, a warning must be given, when feasible, before the use of deadly force") (alterations adopted) (quoting references omitted); *Angulo v. Brown*, 978 F.3d 942, 950–51 (5th Cir. 2020) ("use of force is more likely to be reasonable when officers use 'measured and ascending' actions that correspond to a suspect's level of compliance or resistance."). Providing a warning before utilizing deadly force against a suspect has been described by the Fifth Circuit as "a critical component of risk assessment and de-escalation." *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019). These facts weigh against finding that the use of force was reasonable.

13

In *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009), another case in which the Fifth Circuit has considered qualified immunity, an officer used deadly force against a suspect. After the shooting, the officer discovered that the suspect was not holding a gun when he was killed. The officer had repeatedly ordered the suspect to show his hands, but instead of complying, the suspect reached under the driver's seat of his car to retrieve an object and "then moved as if he had obtained the object he sought." *Id*. at 842, 844. The appellate court held that the use of deadly force was reasonable, regardless of whether a gun was actually found, because when the officer fired, the suspect had: (1) defied multiple orders from officers to show his hands; (2) moved his hands out of the line of sight of the officers; and (3) appeared to retrieve an object that the officers reasonably believed to be a weapon. *Id.* at 845.

In this case, the summary judgment evidence is that Randle had similarly defied orders to stop, attempted to escape, and retrieved an object that the officers reasonably believed to be a weapon. But in contrast to *Manis,* Privette gave Randle no time to comply with the order to show his hands before firing. Nonetheless, "[a]n officer's duty to warn a suspect before using deadly force depends on whether that officer has time to do so." *Renfroe v. Parker*, 974 F.3d 594, 600 (5th Cir. 2020). If Privette reasonably believed that Randle had turned towards him holding a gun in his hand, it may not have been feasible for Privette to adequately warn Randle before shooting him.

The plaintiffs cite *Poole v. City of Shreveport*, 13 F.4th 420 (5th Cir. 2021), but it is not helpful to them. *Poole* involved an unarmed individual experiencing a mental-health crisis. *Id*. at 422. The Fifth Circuit upheld the district court's rejection of the officer's qualified immunity defense after determining that a jury could conclude that the plaintiff, Poole, was visibly empty-handed when shot. *Id*. at 426. The court distinguished *Poole* from cases in which the suspect

made "furtive gesture[s]," causing the apprehending officer to "reasonably fear that the suspect was about to pull a gun from a waistband or other hidden location." *Id.* at 425. The parties also disputed whether the officer gave Poole any warning before the officer shot Poole and whether Poole turned away from the officer just before he was shot. *Id.* The court held that under the circumstances, a jury could conclude that the officer's use of force was objectively unreasonable. But unlike Randle, Poole had no known criminal history or a history of possessing a weapon, and he was not wanted for offenses involving violence. Poole was apprehended solely because the police saw him driving erratically and pursued him. *Id.* at 422. *Poole* is distinguishable.

Privette also cites several cases that he argues show that his actions were not objectively unreasonable. (Docket Entry No. 82). In *Salazar-Limon v. City of Houston*, an officer pulled over Salazar, who was driving a vehicle with three passengers. 826 F.3d at 275. During the stop, the officer tried to handcuff Salazar, who was intoxicated and resisted. *Id.* After a brief struggle, Salazar walked along the passenger side of his truck. *Id.* The officer pulled out his handgun and ordered Salazar to stop. *Id.* Salazar did not comply and took "one or two" more steps. *Id.* The officer testified that Salazar reached toward his waistband in an action "consistent with a suspect retrieving a weapon from his waistband." *Id.* at 276. The officer shot Salazar, who proved to be unarmed. *Id.* The appellate court affirmed summary judgment based on qualified immunity. The court held that the officer's actions were not unreasonable, considering Salazar's resistance, intoxication, his disregard for the officer's orders, and the threat he and the other three men in his truck posed to the officers. *Id.* at 279. *Salazar-Limon* is distinguishable on the basis that Salazar and the officer had had a physical struggle, and the officers had given Salazar an opportunity to obey the officer's orders to surrender, which he disobeyed, before he was shot.

In *Ontiveros v. City of Rosenberg*, a police officer fatally shot Ontiveros while executing a high-risk felony warrant for his arrest. 564 F.3d 379, 381 (5th Cir. 2009). Earlier that day, Ontiveros had threatened to kill two men while brandishing a firearm, pistol-whipped one victim, and fired a weapon before making additional threats while armed with both a pistol and rifle. *Id*. Officers arrived at Ontiveros's home, where they observed someone close a bedroom door. *Id*. When the officers kicked down the door, they found Ontiveros holding an object over his head. *Id*. The officer ordered Ontiveros to show his hands and shot him after seeing him reach for what the officer believed was a weapon. *Id*. A search of the room revealed that Ontiveros was unarmed. *Id*. The Fifth Circuit affirmed the grant of summary judgment on qualified immunity. The court held that the officer's use of deadly force was not clearly unreasonable, because Ontiveros had made violent threats, appeared to be blocking the bedroom door, moved out of sight when the door was opened, and was reaching into a boot where a weapon could be concealed. *Id*. at 383-85. Ontiveros had threatened to kill and had assaulted multiple people with firearms on the day he was shot. The immediacy of the threat he posed to officers and to others could not reasonably be disputed. The officers in this case sought to apprehend Randle for assaults and other crimes that he had allegedly committed over a month earlier. Those offenses had not taken place on the same day Randle was shot.

In *Garcia v. Blevins*, Garcia was fatally shot while holding a gun after refusing a police officer's orders to put down his weapon. 957 F.3d 596, 599 (5th Cir. 2020). An officer investigating a fight at a restaurant found Garcia holding a pistol. *Id*. The officer unholstered his own weapon and ordered Garcia to drop the gun. *Id*. Garcia refused, walked toward his friend, and tried to hand him the gun. *Id*. at 599. The friend stepped away with his hands up. *Id*. There were conflicting accounts as to whether Garcia raised his gun toward the officer or kept it pointed

down, but it was undisputed that Garcia did not disarm as instructed.  *Id*.  The officer then shot Garcia.  *Id*.  The Fifth Circuit affirmed the grant of summary judgment on the basis of qualified immunity.  While there may have been a constitutional violation, the law was not clearly established at the time that Garcia was shot.  *Id*. at 600.  The court emphasized that Garcia was holding a gun and refused to comply with commands to drop his weapon, which he could have turned on the officer or others nearby at any time.  *Id*. at 601-2.  The court emphasized that officers are not required to wait until a suspect turns toward them with a weapon before using deadly force to ensure their safety.  *Id*. at 602.  But that case is distinguishable on the basis that Garcia was shot after he clearly had an opportunity to comply with the officer's directive to disarm, which he refused to do.  Here, the body worn camera footage clearly reflects that Randle was not given adequate time to comply with the warning to show his hands.

In *Carnaby v. City of Houston*, two police officers fatally shot Carnaby after a traffic stop and high-speed car chase.  636 F.3d 183, 186 (5th Cir. 2011).  After Carnaby's car ran out of gas, officers surrounded the car and tried to persuade him to get out.  *Id.*  Carnaby refused, and the officers broke the car windows.  *Id.*  Carnaby then opened the driver's door and leaned toward the floor.  The officers could not see his hands for a brief period before he started to get of car while swinging his hands towards the officers.  Carnaby held an unidentified object in one hand.  *Id*. at 186-87.  The officers fired shots at Carnaby.  It was discovered that he was not holding a gun, but that he had several guns in his vehicle, including one within reach of the driver's seat of the car.  *Id*.  The Fifth Circuit affirmed summary judgment on qualified immunity.  *Id*. at 187.  Given Carnaby's actions, the preceding high-speed chase, and the officers' knowledge that he possessed a handgun license, it was objectively reasonable for officers to believe Carnaby was reaching for a firearm when his hands disappeared from view and he quickly got out of the vehicle while

swinging his hands toward one of the officers, including the hand holding an unidentified object, toward an officer.  *Id*. at 188.  In many ways, the facts in *Carnaby* resemble the facts here.

In *Batyukova v. Doege*, an off-duty deputy encountered the suspect's vehicle on the side of the highway at midnight.  994 F.3d 717, 722 (5th Cir. 2021).  The deputy activated his lights, parked behind the suspect's vehicle, and called 911.  *Id*.  When the suspect got out of the vehicle, the deputy opened his door and ordered her to show her hands and put them on the hood.  *Id*. Instead of complying, the suspect shouted expletives and began walking toward the deputy's vehicle.  *Id*. at 722-3.  The deputy backed up his vehicle to maintain distance and drew his weapon, ordering the suspect to get on the ground and to show her hands.  *Id*. at 723.  The suspect then reached her other hand behind her back toward her waistband, causing her hand to disappear from the deputy's view.  *Id*.  The deputy fired his gun.  *Id*.  The suspect turned out to be unarmed.  *Id*. The Fifth Circuit affirmed summary judgment on qualified immunity grounds.  The court reasoned that the deputy's use of deadly force was reasonable under the circumstances because the suspect had disobeyed commands and reached toward her waistband in what the officer reasonably perceived as a reach for a weapon.  *Id*. at 726-7.  In that case, it was undisputed that the suspect was given a chance to comply with an order to surrender; by contrast, here, Randle was not.

Privette also cites *Argueta v. Jaradi*, 86 F.4th 1084, 1092 (5th Cir. 2023).  (Docket Entry No. 82 at 3).  That case is closely on point.  In that case, Officer Jaradi fatally shot Argueta, who was armed with a handgun.  *Argueta*, 86 F.4th at 1086-87.  Despite dashboard camera footage showing Argueta driving with his lights on and stopping at all stop signs, the officers contended that Argueta's headlights and taillights were off and that he rolled through several stop signs.  *Id*. After the officers turned on their emergency lights, Argueta, "quickly exited the car, turned his left side towards the officers, and ran toward a vacant lot across the street."  *Id*.  Argueta ran with his

right arm pressed against his side, concealing it from the officers. *Id.* Approximately five seconds after Argueta got out of his vehicle, Officer Jaradi shot him. *Id.* The district court denied summary judgment on qualified immunity.

On appeal, the Fifth Circuit noted that "[a]n officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Id.* at 1088. Noting that there were factual disputes as to whether Jaradi could see that Argueta held a weapon, whether Argueta raised a gun or otherwise made a threatening motion towards the officers, or whether Argueta received any warning before Jaradi shot him, the court nonetheless found that the factual disputes were not material to determining qualified immunity. "Even if Argueta never touched his gun and his gun remained completely concealed from the moment he exited the vehicle until after he was shot, that fact is immaterial: Argueta did not need to raise (or even show) his gun or make a threatening motion towards the officers because, by suspiciously concealing his right arm as he fled in a way that objectively suggested he was armed and dangerous, he engaged in a furtive gesture justifying deadly force." *Id.* at 1093. The court noted that there was no case law clearly establishing that "a furtive gesture signaling an immediate threat to officers followed by deadly force without warning constitutes a violation of the suspect's federal rights." *Id.* at 1093.

As in *Argueta*, in this case the summary judgment evidence is that Privette shot Randle after Privette saw that Randle had turned away from the vehicle, apparently about to run, then reached back into the vehicle, then stood back up and turned back to face the officers with an unidentified object held in front of his body. As a result, Privette reasonably believed that Randle was holding a weapon. The plaintiffs' argument that Randle turned back to retrieve a bag of toiletries is undermined by at least two points: first, the implausibility of a man who had tried to

escape the police reaching into a car he had just exited in order to retrieve a bag of toiletries; and second, the discovery after the shooting that the bag in fact contained a loaded firearm.  The circumstances weigh in favor of finding that Privette reasonably believed that Randle's reason for stopping was to be a continued effort to avoid arrest, and that reaching back into his vehicle to retrieve an object was to arm himself and shoot the officers.  When Randle turned to face the officers, Privette reasonably believed that Randle had reached back into the vehicle to retrieve a firearm to shoot the officers in his continued effort to evade arrest.  Given the circumstances and the split-second unfolding of events, it was not objectively unreasonable for Privette to shoot Randle.

While the body-worn camera footage shows that Privette did not give Randle enough time to comply with the order to show his hands, under *Argueta*, that fact alone is insufficient to establish a violation of Randle's constitutional rights.  When Privette shot Randle, Privette knew that Randle had a recent history of violent crime and had active warrants; had tried to flee the police; when blocked, had exited the passenger side of the car; and then reached back into the car to grab an unknown object.  By reaching back into the vehicle he had just left, after trying to evade arrest, Randle's actions "suggested that he . . . possessed, and might in that moment access, a firearm." *Argueta*, 86 F.4th at 1090.

The fact that Randle was later discovered to have retrieved a bag holding a gun, rather than just a gun, does not undermine qualified immunity.  "Officers are entitled to be mistaken about circumstances requiring use of force as long as those mistakes are reasonable**.**" *Gonzales v. City of Austin*, 2025 U.S. Dist. LEXIS 57484, at *52 (W.D. Tex. March 27, 2025) (citing *Heien v. North Carolina*, 574 U.S. 54, 57 (2014)).  Randle was known to be a convicted felon and to have possessed a firearm in the past, was being pursued on felony warrants for violent crimes, had led

20

police on a high-speed chase, exited the vehicle he was riding in, then turned back and reached into the passenger side of that vehicle, emerged holding an object in front of him, and then turned to face the officers. Privette reasonably believed that Randle held a gun that he intended to use on the officers trying to arrest him. Under these circumstances, Privette's use of deadly force against Randle was not objectively unreasonable.

### B. Whether Privette Violated a Clearly Established Constitutional Right

Even if the court were to find factual disputes material to determining whether Privette used unreasonable force, the plaintiffs must also show that Privette's actions violated clearly established law to defeat summary judgment on qualified immunity. "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (emphasis and alteration in original) (quoting *al–Kidd*, 563 U.S. at 741). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'— that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (quoting *al–Kidd*, 563 U.S. at 742).

Under the second prong of the inquiry, "[a] plaintiff may demonstrate clearly established law by identifying a case or body of relevant case law in which a violation of the Constitution was found under factually similar circumstances." *Lewis v. Inocencio*, 2024 WL 229274, at *3 (5th Cir. Jan. 22, 2024) (alterations adopted) (internal quotations omitted). This inquiry is conducted to determine whether the officer "had fair notice that [his] conduct was unlawful." *Brosseau v.*

*Haugen*, 543 U.S. 194, 198 (2004). "Before analyzing whether the law is clearly established, 'we must frame the constitutional question with specificity and granularity.'" *Lewis*, 2024 WL 229274 at *3 (citing *Morrow v. Meachum*, 917 F.3d 870, 874-75 (5th Cir. 2019)).

Resolving the factual disputes in favor of the plaintiffs, the constitutional question is whether, in April 2022, it was clearly established that a police officer violates the Fourth Amendment by using deadly force against a suspect, when: that suspect is a convicted felon with a history of illegally possessing firearms; has three active felony warrants; the suspect was fleeing from the police, then turns back to reach into the vehicle he has just exited to retrieve an unidentified object from the front passenger side; the suspect then turns to face the officers, holding the object in front of him; one of the officers orders the suspect to show his hands; and that officer shoots the suspect without giving him adequate time to comply with the order. The plaintiffs cite the following cases for the principle that shooting a suspect who was not an imminent threat to officers or others is unreasonable as a matter of law: (1) *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996); (2) *Cole v. Carson*, 935 F.3d at 453, 455; and (3) *Poole v. City of Shreveport*, 13 F.4th at 422, 425. (Docket Entry No. 81). In order for these cases to show that Privette violated clearly established law, they must be "factually similar enough to the situation [Privette] faced to have placed the lawfulness of his actions beyond debate." *Baker v. Coburn*, 68 F.4th 240, 246 (5th Cir. 2023), *as revised* (May 19, 2023).

Privette argues that he is entitled to qualified immunity because in April 2022, no precedent would have placed a reasonable officer in his position on notice that using deadly force under the circumstances he faced violated a clearly established constitutional right. Privette argues that the plaintiffs have identified no precedent showing that he violated clearly established law when he shot Randle, because he reasonably believed that the object Randle held was a firearm and that

22

Randle, who had been fleeing to avoid arrest, was about to fire at the police officers trying to arrest him. (Docket Entry No. 61 at 18). After carefully reviewing the cases the plaintiffs cite, the court agrees. The court has already noted that *Poole* is distinguishable on the facts because, among other points, the plaintiff in that case had none of the criminal history that Randle had. Neither *Baker v. Putnal* nor *Cole v. Carson* is sufficiently similar to show that Privette's actions violated clearly established law.

In *Baker v. Putnal*, witnesses told a police officer that one or more individuals in a red vehicle had a shotgun after a fight broke out on a public beach. *Baker*, 75 F.3d at 193. The officer approached a truck with two men sitting inside that was parked near the beach. *Id.* As the officer neared the truck, the man sitting in the passenger's seat of the truck turned toward the officer. *Id.* The officer shot and killed the man in the passenger's seat. *Id.* A pistol was later found under the passenger's seat. *Id.* The Fifth Circuit reversed the district court's grant of summary judgment to the officer on qualified immunity. *Id.* at 198. The court found factual disputes material to determining qualified immunity, including whether: (1) the decedent took any threatening actions towards the officer as he approached the truck; (2) whether the officer gave the decedent a warning before using deadly force; and (3) whether the decedent was holding the pistol or pointing it at the officer when the officer shot him. *Id.* The court found that the "only uncontroverted evidence is that there was a good deal of confusion on the beach and that [the decedent] at least began to face [the officer] from [the decedent's] position in the truck." *Id.* The court also noted that the decedent had been shot multiple times, and that his wounds suggested that he had been shot while facing away from the officer. *Id.*

In some ways, the facts in *Baker* are similar to the facts here. In both cases, the officer believed, but could not clearly tell, that the suspect was armed. And in both cases, a firearm was

23

found after the shooting. Both cases present the kind of split-second decision that officers must make in the face of fast-moving events. But in *Baker,* unlike the present case, the officer had no information about, and no earlier interaction with, the suspect. Privette, by contrast, knew of Randle's criminal history, including a history of illegally possessing a firearm, and had been pursuing Randle as he attempted to avoid arrest. The court in *Baker* noted the chaotic scene but stated that the suspect's "mere motion to turn and face [the officer] are not compelling reasons to find that [the officer's] use of force was not excessive as a matter of law." *Id.* By contrast, here, Privette knew much more information about Randle's past and just after Randle had attempted to avoid arrest. That knowledge, and Randle's actions before the shooting, significantly change the calculus.

In *Cole v. Carson*, a suicidal 17-year-old was reported to be walking around a neighborhood with firearms. *Cole,* 935 F.3d at 448. A police officer searching for the young man testified that he overheard a witness stating that the young man had been persuaded to give up one of two guns in his possession. *Id.* After searching the area, the officer saw the young man walking away from other officers while holding a gun to his head. *Id.* The officers followed to try to intercept the young man, but two of the officers, including the defendant, fired shots. *Id.* Viewing the facts in the light most favorable to the plaintiffs, the district court found that the officers had not given the young man a warning that gave him time to respond before shooting him. *Id.* at 449. When the officers shot, the young man was facing away from the officers with his own gun still pointed at his head. *Id.* The officers who shot did not know that the young man had shot himself in the temple at the same time. *Id.* The young man survived, but with severe mental and physical disabilities. *Id.* at 450. The police officers sought immunity by arguing that the officer had given a warning that the young man ignored and instead turned to face the officers and pointed his gun

24

at them.  *Id.*  The ballistics report showed that the young man had instead held the gun to his head until he shot himself in the temple.  The district court denied summary judgment on qualified immunity, finding unresolved factual disputes.

On appeal, the Fifth Circuit found that the summary judgment facts showed that the young man posed no threat to the officers or others that would justify shooting him without a warning. *Id*. at 453.  A reasonable jury could find that he made no threatening or provocative gestures, posed no immediate harm to anyone but himself, and that, although the officers had time to warn before shooting, no warning was given.  *Id.* at 455.  The court concluded that the shooting violated clearly established law.  *Id.*

In this case, as in *Cole*, a reasonable jury could find that Privette did not give an adequate warning before shooting Randle.  But in *Cole*, the suspect was a suicidal teenager, known to be in possession of a gun, but with no other violent or criminal history.  Here, the suspect had a history of possessing firearms, had led police on a chase to avoid arrest, and had reached into the passenger side of the car he had just left and retrieved an object, which he held in front of him as he turned to face the police officers.

The plaintiffs also cite *Sanchez v. Fraley*, 376 F. App'x 449 (5th Cir. 2010), *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Crane v. City of Arlington*, 50 F.4th 453 (5th Cir. 2022), for the principle that shooting a suspect who was not an imminent threat at the time of the shooting, based on events occurring just before the shooting, is unreasonable as a matter of law.  (Docket Entry No. 66 at 23).  *Sanchez* is an unreported, nonprecedential case.  While such cases may "aptly illustrate[] the established right," they cannot clearly establish the law for the purpose of the qualified immunity analysis.  *Cooper v. Brown*, 844 F.3d 517, 525 n.8 (5th Cir. 2016).  *Crane* involved a suspect who was shot and killed by police as he tried to comply with an officer's order

to surrender.  50 F.4th at 453.  By contrast, Randle had been resisting officers' efforts to arrest him and it is unclear whether he would have complied with the order to show his hands when he was shot.  But *Crane* was decided in October 2022; this shooting happened in April 2022.  The officers did not know of the holding in *Crane* when Randle was shot.

*Garner* stands for the general proposition that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead" unless "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm."  *Garner*, 471 U.S. 1 at 11.  At that point, "deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  *Id.* at 11-12.  The Supreme Court has held "that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'"  *White v. Pauly*, 580 U.S. 73, 80 (2017) (quoting *Brosseau v. Haugen*, 543 U. S. 194, 199 (2004) (per curiam)).  This case is not an obvious case.

The plaintiffs also argue that if a jury determines that Privette shot Randle without a reasonable belief that he posed a danger of death or serious bodily injury to the officers, then, as a matter of law, no reasonable officer could believe that firing on Randle would not have violated Randle's constitutional rights.  (Docket Entry No. 66 at 24).  But there can be a constitutional violation that does not meet the clearly established prong of the qualified immunity test.  *See Garcia v. Blevins*, 957 F.3d at 599.  An officer need only prevail on one of the two prongs to be entitled to summary judgment on qualified immunity.  *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  Here, the court has found that Privette prevails on both prongs.

The plaintiffs have not pointed to sufficient authority clearly establishing that Privette's conduct violated the law under the specific circumstances he faced. Privette is entitled to qualified immunity on this ground as well.

**IV.    Conclusion**

The motion for summary judgment, (Docket Entry No. 61), is granted.

SIGNED on August 8, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

27